IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DEMETRIUS JOHNSON : CIVIL ACTION
:
        Plaintiff, : NO. 10-4659
:
   v. :
:
DALE A. MEISEL, ERIK VON KIEL, , :
DR. WILSON, MEGAN HUGHES, and :
PRIMECARE MEDICAL, INC. :
:
        Defendants. :

## MEMORANDUM

**Jones, II, J.**                                               **February 20, 2013**

       Demetrius Johnson, a prisoner in state custody at the Lehigh County Prison ("LCP"),

brought this civil rights action pursuant to 42 U.S.C. § 1983 alleging that all Defendants were

deliberately indifferent to his serious medical condition. Presently before the Court is a Motion

for Summary Judgment filed by Defendants Erik Von Kiel, Dr. Wilson, Megan Hughes and

PrimeCare Medical, Inc. ("the Medical Defendants") (Dkt. No. 34), along with a Statement of

Undisputed Facts ("MD SUF") (Dkt. No. 35). Also before the Court is a similar Motion filed by

Defendant Dale A. Meisel (Dkt. No. 37) and Statement of Undisputed Facts ("Meisel SUF")

(Dkt. No. 38). Johnson has filed a Joint Response to the Motions (Dkt. No. 39), his own

Statement of Undisputed Facts ("Pl. SUF") (Dkt. No. 40), and a Statement of Disputed Facts (Pl.

SDF") (Dkt. No. 41). For the reasons set forth below the Defendants' Motions will be granted.

## I.   LEGAL STANDARD

       Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. An issue is genuine if the fact finder could reasonably return a verdict in favor of the nonmoving party with respect to that issue. *Anderson*, 477 U.S. at 249. In reviewing a motion for summary judgment, the court does not make credibility determinations and "must view facts and inferences in the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## II.   FACTS

Plaintiff Johnson alleges that, after being incarcerated at the LCP in the spring of 2009, he began to experience severe abdominal pains and significant amounts of blood in his bowel movements. (Am. Compl. ¶¶ 13-14.) Over a period of one year, he experienced sharp and crippling abdominal pains, vomiting, spontaneous and persistent rectal bleeding, insomnia due to pain, and dramatic weight loss (including an alleged weight loss during an undisclosed period of two weeks). (*Id*. at ¶15.) Beginning in August of 2009, he repeatedly and regularly notified Dr. Von Kiel and Dr. Wilson, PA. Megan Hughes, and Warden Meisel of his symptoms and condition and requested medical treatment. (*Id.* at ¶ 17.) Johnson alleges that these requests for treatment were communicated via written sick call requests, written staff requests, inmate

grievances, grievance appeals, and verbal requests. (*Id*. at ¶18.) He alleges that Drs. Von Kiel and Wilson and P.A. Hughes told him that there was "nothing wrong with him" and he had to "hope the bleeding stops." (*Id*. at ¶19.)

Johnson next alleges that the Medical Defendants did not perform diagnostic tests to assess his condition or refused to honor Johnson's request for further testing, leading to his filing of numerous grievances. (*Id.* at ¶ 20.) He alleges that instead of performing diagnostic tests, Drs. Von Kiel and Wilson prescribed inappropriate medications that were ineffective. (*Id*. at ¶ 21.) He alleges that in August 2010, after he expressed his intentions to file this lawsuit, he was sent to St. Luke's Hospital in Bethlehem for diagnosis and treatment, where he was seen by Dr. Daniel Bowers who ordered a colonoscopy and diagnosed Johnson with proctitis in his distal rectum and prescribed medication which resulted in the almost complete cessation of Johnson's symptoms. (*Id*. at ¶¶ 24-29.) Thereafter, he was taken for four (4) follow-up appointments relative to this outside consultation. (*Id*. at ¶ 30.) He alleges that this conduct constituted deliberate indifference by all Defendants to a severe medical condition in violation of 42 U.S.C. § 1983. (*Id*. at ¶¶ 6-7, 37-38.) He also alleges that PrimeCare failed to properly train and supervise its employees in providing adequate diagnostics and medical care, which constituted deliberate indifference. (*Id*. at ¶¶ 38-40.)[1] Johnson contends that Defendant Meisel, as warden of LCP, had the authority to decide inmate grievance appeals and take steps to address the denial of prisoner grievances, yet summarily denied his grievances without adequate investigation and without consideration to his serious medical needs, because he was under pressure to reduce costs associated with treating LCP inmates. (*Id.* at ¶¶ 23, 31.)

---

[1]Johnson also brought claims against Dr. Wilson for an alleged sexual assault committed during a rectal exam. (Am. Compl. ¶¶ 7-9). Johnson has since voluntarily dismissed those claims. (*See* Dkt. Nos. 31- 32.)

Defendant PrimeCare is the exclusive medical care provider to LCP inmates pursuant to a contract between PrimeCare and Lehigh County; it is the sole supplier and coordinator of all health care programs at LCP. (Meisel SUF, Ex. A at 1, I; Ex. A, App. A at 15, 1.2.2; Ex. B at 45-47; Ex. C at 19-20.) Pursuant to the contract, PrimeCare is a third party vendor to LCP, and as a vendor, PrimeCare's employees are not employees of Lehigh County or LCP. (Meisel SUF Ex. A; Ex. B at 18.) PrimeCare, not LCP or Defendant Meisel, makes all decisions relating to an inmate's medical treatment, including but not limited to whether or not an inmate needs to receive outside medical attention or whether he or she will need to go to a hospital. (Meisel SUF Ex. A; Ex. B at 46-47.) Nonetheless, "medical access" is an issue that may be raised by an inmate through the inmate grievance process. (Meisel SUF Ex. F at 2; Ex. G at 21.) Warden Meisel is the final arbiter of an inmate grievance. (Meisel SUF Ex. F at 4.)

When Johnson was booked at LCP on May 21, 2009, he received an Initial Medical Intake and Suicide Screening. (MD SUF Ex. A at 1-6.) Johnson disclosed that he was taking the medications Risperdal and Trazadone upon intake and the same was ordered for him in the Prison. (*Id.* at 2, 8-9.) No medical complaints were noted at intake. (*Id.* at 1-6.)

Johnson's first complaint of any gastrointestinal symptoms occurred on August 8, 2009, when he complained of nausea and indigestion. (*Id.* at 306.) He was seen by a nurse on August 11, 2009. (*Id.* at 69.) He was prescribed Prilosec by Dr. Von Kiel; this was later changed to Zantac on September 10, 2009, but changed back to Prilosec on September 14, 2009. (*Id.* at 11-12, 15.) On September 9, 2009, Johnson submitted a Sick Call Request indicating that he sometimes observes bleeding in the toilet with some bowel movements. (*Id.* at 302.) His medical chart notes "blood in stool.? GI bleed . . . I/m states he has blood in his stool. he was just seen 9/10/09. states the amount has gotten larger since then. . . Bright red blood. +

constipated and hard stools. . . . will add Metamucil will order labs and schedule f/u." (*Id.* at 371-72.) On September 10, 2009, Johnson was seen by PA. Hughes on a Sick Call Request for complaints of gastrointestinal upset including two trips to the medical department that week for complaints of chest pains after eating and blood in his stool. (*Id.* at 180.) He was placed on a bland diet by PA. Hughes after this appointment. (*Id.* at 74.) Johnson was also prescribed Colace stool softener and Simethicone to treat intestinal gas. (*Id.* at 13-14.) On September 14, 2009, he was prescribed Metamucil when it was noted that he was constipated with hard stools. An internal hemorrhoid was suspected. (*Id.* at 14-15, 180.) Diagnostic testing was also ordered for Johnson, including a hemoccult test to determine if there was blood in his stool, which was administered on September 16, 2009. (*Id.* at 77.)

On September 20, 2009, Johnson was weighed to compare his weight at intake, and it was discovered that he had suffered a 9 pound weight loss since May 2009. (*Id.* at 78.) It was also noted that Johnson had not had a bowel movement in three days and that he was still constipated despite Metamucil. (*Id.* at 180.) Johnson complained of a small amount of blood in his last stool. (*Id.*) On September 23, 2009, an x-ray was ordered for Johnson, (*id.*), and on September 24, 2009, radiologist Charles Woodruff, M.D., authored a report finding a normal gas pattern and no evidence of a bowel obstruction or kidney stones in the x-ray. (*Id.* at 299). Between October 2 and 14, 2009, Johnson intermittently refused doses of Metamucil. (*Id.* at 36-37.) On October 15, 2009, after his release from more than a week of disciplinary segregation, Johnson complained of more blood in his stool and stomach pain, and a 15-pound weight loss since intake was noted. LPN Dolores Lutzko noted that it was very difficult to get answers from Johnson and that he had not eaten in two to three days while in segregation confinement. (*Id.* at 84.) Johnson was scheduled to see P.A. Hughes the next day for the complaints of stomach pain

and blood in stool.  (*Id.* at 85.)  The medication dispensary chart reveals that between October 12

to November 4, 2009, Johnson had repeatedly refused his medications or failed to present for

medication rounds.  (*Id.* at 38.)  On November 4, 2009, Johnson again complained of rectal

bleeding.  When he was seen by P.A. Hughes, Johnson admitted he was not taking the

Metamucil and refused a rectal exam.  (*Id.* at 181.)

On November 13, 2009, Johnson was seen by Dr. Wilson who noted that Johnson denied

any GI family history.  (*Id.* at 92, 181.)  Johnson stated he had been nauseated for two months

and had a bitter taste in his mouth.  (*Id.*)  Johnson stated that he ate a lot, spending about $70 per

week on commissary food.  (*Id.*)  He indicated that he had some constipation and strained when

making a bowel movement.  (*Id.*)  A rectal exam was performed.  (*Id.*)  It was noted that Johnson

was concerned about his weight loss and requested to see a male doctor related to his rectal

bleeding after Dr. Wilson opined that Johnson's weight loss was normal for being in the prison

environment.  (*Id.*)  She noted that Johnson was "instructed no more than 50 repetitions of any

exercise a day.  No other therapy needed."  (*Id.* at 373.)  Between November 20 and December 4,

2009, Johnson mostly refused medications or failed to appear for medication distribution rounds.

(*Id.* at 41-42.)

On December 1, 2009, Johnson was seen by Dr. Von Kiel who ordered that a check of his

GI status and a fasting complete blood count ("CBC"), urinalysis and hemoccult stool x 3 be

performed.  (*Id.* at 98.)  These tests were performed the next day.  (*Id.*)  The results of all three

hemoccult samples were negative.  (*Id.* at 160.)  On December 4, 2009, Dr. Wilson reviewed

Johnson's lab results, and Johnson indicated that he had been moving his bowels better and

requested to go off the bland diet.  (*Id.* at 100, 182.)  On December 23, 2009, Johnson's request

to be placed back on Metamucil, which had been discontinued on December 4, 2009, after his

continued refusals to take it, was granted. (*Id.* at 17, 42, 107.) Between December 25 and 27, 2009. Johnson refused all medications. (*Id.* at 42.)

On December 28, 2009, Johnson complained of vomiting and stomach pains and was seen by a nurse. Two days later Johnson was assessed by P.A. Hughes for these complaints and was prescribed Bentyl for his irritable bowel symptoms and Pepto-Bismol. (*Id.* at 18-19.) On January 1, 2010, another fasting CBC was ordered and Johnson was provided with Ensure or equivalent with his meals. (*Id.* at 111.) Dr. Von Kiel noted that Johnson may be suffering from ulcers and placed him on a bland diet, noting a loss of nine pounds since intake in May 2009. (*Id.*) The fasting CBC was performed the next day. (*Id.* at 112.) Between January 15 and 20, 2010, Johnson again refused or failed to report to receive his medications. (*Id.* at 44.)

On January 22, 2010, Johnson's weight was rechecked and a four pound weight loss was noted since January 5, 2010. (*Id.* at 115.) The bland diet and Ensure were discontinued, and it was noted that Johnson would start a food log as of Monday for one week and commissary records were pulled to track Johnson's food intake. (*Id.*) Between March 6 and 20, 2010, Johnson refused or failed to report to receive his medications almost every day. (*Id.* at 46-47.)

The next complaint of the reoccurrence of rectal bleeding was on March 17, 2010. (*Id.* at 222.) On March 19, 2010, Dr. Von Kiel noted Johnson's continued complaints of rectal bleeding. (*Id.* at 374.) Hemoccult tests were ordered and Johnson was directed to bring his stool specimen to the medical department of evaluation for the next three days. (*Id.* at 118-119.) The first hemoccult test was positive for blood in the stool but the second and third tests came back negative. (*Id.* at 161.) He was seen again on April 4, 2010 by Dr. Wilson, who recorded "continues to c/o rectal bleeding. Still states that he is constipated at times." She also noted that he refused a rectal exam. (*Id.* at 376.) On April 12, 2010, Dr. Wilson again prescribed Colace,

and Johnson was given Tums and hemorrhoid cream. (*Id.* at 21-22.) On April 20, 2010, and May 12, 2010, it was again noted that Johnson continued to complain of blood in his stools when seen by a nurse. (*Id.* at 122-124.) During this time period, Johnson again frequently refused or failed to appear for medical distribution. (*Id.* at 48-50.)

Three more hemoccults were ordered on May 4, 2010, and two of the three came back positive for blood. (*Id.* at 161.) On May 14, 2010, it was noted that Johnson was being followed by the doctors for this complaints and that he refused a rectal exam. (*Id.* at 125, 377.) Also on May 14, 2010, a comprehensive metabolic panel ("CMP") was ordered and Johnson was placed on a weight gain diet for thirty days. (*Id.* at 125-126). He was given another CBC on May 15, 2010. (*Id.* at 124-125.) On May 18, 2010, the weight gain diet was discontinued by Dr. Wilson, who found that Johnson's weight was normal for his height, that he had no evidence of emaciation, had no diseases to cause emaciation and that he had gained weight overall since coming to the prison. (*Id.* at 127.) Dr. Wilson noted "no actions needed. continued hemorrhoid cream. No evidence of crohn's behavior or ulcerative colitis. Constipation probably results in excoriations. Never reports any mucous with stool." (*Id.* at 377.)

On June 8, 2010, Johnson again complained of rectal bleeding and was seen by a nurse. (*Id.* at 128.) He was again prescribed Zantac, which was later changed to Prilosec on July 11, 2010. (*Id.* at 24-25, 378). On June 21, 2010, Johnson asked to see a GI specialist. (*Id.* at 132.) On June 25 and July 6, 2010, he again complained of blood in stool to the medical assistant. (*Id.* at 133, 137, 378.) Dr. Wilson noted "doubt any significant pathology from 'rectal bleeding' as no one has ever found an abnormal exam and he has no other complaints. Suspect he has functional tear from stooling intermittently and possibly a fixation on rectal issues. . . . Informed he he [sic] needs to leave there was nothing we could do about intermittent blood on toilet

tissue." (*Id.* at 378.) On July 12, 2010, Johnson requested an appointment with Dr. Von Kiel and produced a stool sample. (*Id.* at 139.) It was noted that Johnson complained of "frank red blood WITNESSED in toilet and on toilet paper." (*Id.* at 379.) On July 13, 2010, Dr. Von Kiel decided to refer Johnson for a possible colonoscopy noting that he had been seen and been on multiple medications and treatment modalities for his complaints over the course of almost one year. (*Id.* at 140.)

On July 16, 2010, Dr. Wilson ordered several more tests on Johnson's stool specimen to determine indications for possible colonoscopy. (*Id.* at 142.)[2] One month later, on August 16, 2010, Johnson's treatment notes state "will see on Tuesday for recheck and labs review, possible colonscopy [sic]." (*Id.* at 149.) On September 10, 2010, Johnson again complained of blood in his stool. (*Id.* at 153.) His dose of Colace was increased and he was again encouraged to properly hydrate. (*Id.* at 379-80.) On September 21, 2010, Johnson complained of abdominal pain accompanied by bloating and gas. (*Id.* at 156, 188, 380.) Johnson also complained of rectal bleeding and stomach rumbling; he was noted to be on stool softener and gas medications, that his diet was okay and he was not losing weight. (*Id.* at 188.) On October 8, 2010, Johnson was seen by an outside gastroenterologist because of his history of irritable bowel syndrome, and "complicated ongoing issues." (*Id.* at 159.)

Dr. Wilson testified at her deposition that she saw Johnson in November 2009, after he had made complaints of chronic constipation, causing rectal bleeding and straining at the stool. (MD SUF Ex. B at 89-94.) She opined that Johnson's complaints of rectal bleeding did not "raise a flag" because he was not taking his medications appropriately, not drinking water and

---

[2] This Court notes that the Medical Defendants assert as fact that on July 14, 2010, radiologist Zachary Fisher, M.D. of Mobilex authored a radiology report noting that Johnson's abdominal exam was unremarkable. There is no citation to the summary judgment record to support this assertion, but Johnson does not dispute its factual correctness.

was complaining of constipation, all of which would have contributed to rectal bleeding. (*Id.* at 93.) She did not suspect that Johnson had colitis, but rather that he was constipated as a result of his non-compliance with medications, which was causing his symptoms including rectal bleeding. (*Id.*) She testified that there was no clinical indication that Johnson had colitis and her physical examination and his history did not indicate that he had colitis. (*Id.* at 100.) He also did not present as having colitis since his abdominal exams were "totally benign," he was not losing weight other than might be considered normal due to his incarceration, and there was no indication of any elevation in white blood cell count indicating inflammation. (*Id.* at 101.) She testified that, after seeing Johnson seven times in approximately six months with complaints of rectal bleeding, it was her opinion that the frequency of his complaints was not significant because, although he was constipated, he was non-compliant with his medications, and constipation itself will cause an irritation of the rectum, and can cause tears which bleed with a bowel movement. (*Id.* at 110-111.) Dr. Wilson was aware that Johnson was seen by an outside provider for a colonoscopy which revealed proctitis. She testified that proctitis is an inflammation of the rectum with symptoms of irritation, itching, and irritating pain in the rectum, which may cause blood, but is not associated with stomach pain. (*Id.* at 55-56.) Dr. Wilson did not view proctitis as a "significant illness as far as weight loss or anything else that he was talking about." (*Id.* at 132.)

Dr. Wilson testified that the only way to diagnose proctitis is through the use of an endoscope. (*Id.* at 57.) She stated that symptoms of acute colitis may include rapid weight loss, diarrhea, abdominal cramps, pain and sometimes a vague constitutional sign, such as loss of appetite. (*Id.* at 63.) She further stated that symptoms of chronic colitis may include abdominal

pain, diarrhea and mucus or blood in their stools. (*Id.* at 64.) If an LCP inmate is diagnosed with colitis, the first-line treatment would be to prescribe the medication Asacol. (*Id.* at 65.)

Dr. Wilson recalled that Johnson had requested a colonoscopy, but she determined that he did not need one. (*Id.* at 126.) In the past, she has ordered a colonoscopy for an inmate who had loss of appetite, rapid weight loss and bloody stools. (*Id.* at 68-69.) She testified that if a prisoner was being seen for the same medical condition, it would be the practice of the PrimeCare employee to review the prisoner's past medical history. (*Id.* at 82-83.) When she learned that Mr. Johnson had been diagnosed with proctitis, she stated that the diagnosis did not surprise her because proctitis "isn't a significant illness as far as weight loss or anything else that he was talking about." (*Id.* at 132.)

Dr. Erik Von Kiel is the medical director at LCP where, besides treating patients, he also deals with quality assurance issues. (MD SUF Ex. C at 10.) He testified that proctitis is not common at LCP, but hemorrhoids are common and can be related to proctitis. In his opinion, proctitis could present with no symptoms, soreness, or bleeding, and a diagnosis would have to be confirmed by a sigmoidoscopy or colonoscopy. (*Id.* at 37.) Treatment would include treating any underlying hemorrhoidal condition, and examining any underlying factors, such as diet and constipation. (*Id.* at 38-39). Dr. Von Kiel testified that proctitis would require treatment outside the Prison if symptoms such as inflammation and bleeding progressed and the case became acute, such as where bleeding would not stop. (*Id.* at 45.) In less severe cases, LCP medical staff would first attempt to treat and heal the condition at the Prison. (*Id.*) He stated that a colonoscopy, the highest level diagnostic test, would only be ordered after other tests, such as sigmoidoscopy or a barium enema had been used first to confirm proctitis. (*Id.* at 46.) Proctitis is usually treated with steroids, which can be a prescription or over-the-counter. (*Id.* at 48.) Dr.

Von Kiel indicated that PrimeCare has never refused to supply an inmate patient with a non-formulary drug. (*Id.* at 52.)

Dr. Von Kiel testified that in February 2010, he ordered that Johnson be supplied a weight gain product; after three months, he had gained 20 pounds so the product was discontinued. (*Id.* at 64.) On April 27, 2010, he asked Johnson's permission to perform a rectal exam in response to his complaints of bleeding, but Johnson refused and indicated that the bleeding had resolved. Dr. Von Kiel believes that he was requested to do this exam by a member of Warden's staff, in response to a complaint Johnson had filed about his medical care. (*Id.* at 65.) On May 13, 2010, Dr. Von Kiel was again asked by the Warden's staff to examine Johnson, who had complained of blood in his stools. (*Id.* at 66.) He performed a rectal exam, noting internal hemorrhoids and that the stool was normal on examination, with a small amount of blood noted at the hemorrhoid site, which he stated was a typical finding. (*Id.* at 67.) He testified that he would first attempt to treat the hemorrhoids with medications, but if the problems continued, it would indicate the need for further testing. (*Id.* at 68.) He noted that Johnson had intermittent complaints, that his condition would improve and then regress, but that all of his symptoms were minor, and that there were months where Johnson would not experience any blood. (*Id.* at 69.)

In July 2009, Dr. Von Kiel ordered an x-ray and blood test which were normal. (*Id.* at 70-71.) He scheduled Johnson for a colonoscopy to assess his condition. (*Id.* at 73.) That test was performed in October 2010, and Johnson consulted with a gastroenterologist. (*Id.* at 72.) The October consult revealed internal hemorrhoids and proctitis of the distal rectum. (*Id.* at 78.)

Dr. Daniel Bowers, the outside gastroenterologist who consults on LCP inmates, examined Johnson on October 8, 2010, and performed a rectal exam and an anoscopy. (MD

SUF Ex. D at 7, 26-28.)  The tests revealed two grade-two internal hemorrhoids, meaning that they are expected to reduce spontaneously, and which is a relatively early grade hemorrhoidal disease.  (*Id.* at 28.)  He testified that proctitis and hemorrhoidal symptoms often mimic each other and the way to tell the difference would be through a colonoscopy.  (*Id.* at 18.)  He stated that proctitis and colitis are generally treated with topical medications such as suppositories.  (*Id.* at 13-14.)  Medications such as Colace, Metamucil and Dulcolax are not specifically used to treat proctitis.  (*Id.* at 15-16.)

As a result of his October 8 examination, Dr. Bowers ordered a colonoscopy because Johnson had bleeding for a period of time which was not conclusively explained by the hemorrhoids that presented at the time.  (*Id.* at 29.)  He testified that if a patient has bleeding, he always recommends an endoscopy, which can be a sigmoidoscopy or colonoscopy, if they have a new onset of bleeding without prior endoscopy.  (*Id.*)  He noted that Johnson had hard stool present in his rectum.  He told Johnson to increase his fiber intake, and ordered a fiber supplement and stool softener, Colace.  (*Id.* at 29-30.)  As noted, the colonoscopy was performed on October 22, 2010.  Based upon the test, Dr. Bowers reported that Johnson had hemorrhoidal disease, active colitis consistent with ulcerative proctitis and inflammatory bowel disease.  (*Id.* at 32; Pl. Ex. 6.)  He recommended in the October 22 report that Johnson be placed on a Canasa suppository once per night, which is an anti-inflammatory medication.  (MD SUF Ex. D at 35.)  Dr. Bowers noted, however, at Johnson's next follow-up visit on December 2, 2010 that he had not  been provided with Canasa, as recommended on October 22; accordingly, he "added [Canasa] as an order because the patient informed me that he was not receiving a suppository nightly."  (*Id.* at 37; Pl. Ex. 7 at 3.)  For the next visit on March 7, 2011, Dr. Bowers noted that Johnson "is doing well and reports no further bleeding episodes. he is currently taking Canasa

nightly." (Pl. Ex. 8 at 1.) Dr. Bowers described Johnson's proctitis as mild, meaning he experienced some inflammation and redness, and edema of the tissues consistent with inflammation, but his condition had not risen to the level of severe or significant. (MD SUF Ex. D at 49-50). He opined that it would be reasonable for a doctor to recommend that a patient increase fluid intake, and prescribe medications such Colace, Metamucil, and Dulcolax to treat constipation or hard stool. (*Id.* at 52.)

At his deposition, Johnson testified that Dr. Von Kiel violated his constitutional rights by "when I was talking about the pain I was in and the bleeding, he wouldn't prescribe medication for me. They wouldn't help me." (MD SUF Ex. E at 21.) He testified that he experienced "lower stomach pain, sometimes pain in my bowel movements." (*Id.*) With regard to bleeding, Johnson testified that it was "in the bowel movement." (*Id.* at 22.) He stated that Dr. Wilson violated his constitutional rights because "she would not help me. She would not prescribe medication for me. And every time I tell her something is wrong with me, she tell me nothing is wrong with me. . . ." (*Id.* at 22.) He testified that P.A. Megan Hughes violated his constitutional rights because "at first she gave me some medication that was not helping me. Made my condition worser (sic)" and "she put me on a bland diet." (*Id.* at 23-24.) He testified that PrimeCare violated his constitutional rights "because I wrote a request to the nurse office of the situation to get help and that response back was I really didn't need help. And I filed a grievance about it and was still nothing done about it . . . and ain't no (sic) medication we got here to help you." (*Id.* at 25-26.)

Johnson conceded that he was seen by multiple medical providers more than a dozen times at the Prison about his complaints of abdominal pain and rectal bleeding. (*Id.* at 27.) He agreed that he was seen for each sick call slip unless he was seen recently for the same

complaint. (*Id.* at 28.) He conceded that he was prescribed medications for his complaints including a "[s]tool softener, one for like an ulcer," (*id.* at 30), he received diagnostic tests at the prison concerning his medical complaints, (*id.* at 32), he was sent to see Dr. Bowers who prescribed him medication (*id.* at 37), and that he was symptom free for a while, even though his symptoms are now coming back. (*Id.*) He conceded that he is currently receiving treatment in the form of Canasa and Metamucil. (*Id.* at 40.)

LCP's grievance procedures provide that inmates are to first submit grievances informally and then formally on a grievance form. (Meisel SUF Ex. F at 3.) At that point, the grievance is forwarded to LCP's Grievance Coordinator for assignment to the appropriate LCP or PrimeCare staff member for investigation and response. (*Id.*) An inmate may then appeal a grievance by submitting an appeal to the Warden within seven days from the Grievance Coordinator's decision, prompting a written decision from the Warden within fifteen calendar days. (*Id.*) A grievance may be denied following an investigation, or rejected due to a procedural defect; rejected grievances are nonetheless investigated to see if it might have merit. (Meisel SUF Ex. B at 64, 120; Ex. G at 21.) Warden Meisel authored the LCP grievance policies. (Meisel SUF Ex. B at 69.)

Plaintiff first filed a grievance relating to his medical treatment on September 17, 2009, complaining of blood in his bowel movements and stomach pains. (Meisel SUF Ex. H at 1; Ex. B at 89, 92.) This grievance was referred to the health service administrator of PrimeCare and Carol Sommers, LCP's Grievance Coordinator, to be investigated. (Meisel SUF Ex. H at 2; Ex. B at 89-93.) Following an investigation, the grievance was denied on the ground that Plaintiff was receiving medical care and PrimeCare was adequately addressing his medical treatment concerns. (Meisel SUF Ex. H at 3; Ex. B at 93-94; Ex. G at 31-33.) On December 29, 2009,

Johnson filed his second grievance relating to stomach pains and rectal bleeding. (Meisel SUF Ex. I.) This grievance was investigated in accordance with LCP's procedures and was denied after a finding that Johnson was being treated and had received adequate medical care by PrimeCare. (Meisel SUF Ex. I at 2; Ex. G at 31-33; Ex. B at 94-98.) Johnson appealed this grievance denial to Warden Meisel, who conducted further investigation and ultimately denied the appeal after determining that PrimeCare had adequately addressed his medical issues. (Meisel SUF Ex. I at 4; Ex. B at 94-99.) Although he denied the appeal, Meisel nonetheless asked Dr. Von Kiel to further evaluate Johnson's medical concerns. (Meisel SUF Ex. I at 4; Ex. B at 98-99.)

Also on December 29, 2009, Johnson filed his third grievance, relating to alleged disrespectful conduct by a nurse, which was rejected as a result of it not being timely filed. (Meisel SUF Ex. J; Ex. B at 100-101; Ex. G at 34.) Meisel agreed that Johnson had not followed LCP's procedures relating to timeliness of grievances and therefore denied the appeal. (Meisel SUF Ex. J; Ex. B at 100-101.) Meisel admitted that, in denying the appeal one the basis that it was untimely, he did not personally investigate the merits of the issue grieved. (Meisel SUF Ex. B at 101.)

On January 5, 2010, Johnson filed his fourth grievance, alleging blood in his bowel movements and significant weight loss. (Meisel SUF Ex. K; Ex. B at 102-105.) This grievance was denied following an investigation and determination that Johnson had received adequate medical care. (Meisel SUF Ex. K at 2; Ex. B at 102-105.) It was found that PrimeCare had performed x-rays and blood work, had evaluated Johnson's vital signs, and had determined that his weight loss was normal. (Meisel SUF Ex. K at 2.)

Plaintiff filed his fifth grievance on January 13, 2010, again complaining of bleeding, weight loss and improper treatment.  (Meisel SUF Ex. L at 1; Ex. B at 108-109.)  This grievance was rejected as frivolous after a determination that Plaintiff's issues had been investigated and addressed in response to previous grievances.  (Meisel SUF Ex. L at 2; Ex. B at 108-109; Ex. G at 36.)

On or about July 8, 2010, Johnson filed his sixth grievance alleging a sexual assault by Defendant Wilson during a medical examination.  (Meisel SUF Ex. M; Ex. B at 110.)  This grievance was rejected after LCP and PrimeCare performed an investigation of the substance of the allegations.  (Meisel SUF Ex. M at 4-6; Ex. B at 110-120.)  Johnson's appeal of this determination was denied on the basis of the investigation into its substance, with Meisel finding that the allegations were unfounded.  (Meisel SUF Ex. M at 6; Ex. B at 122-124.)  By Stipulation filed August 21, 2012, Plaintiff dismissed his claims relating to the alleged sexual assault that prompted the grievance dated July 8, 2010 and subsequent appeal.  (Dkt. No. 32.)

Johnson filed his seventh grievance on September 27, 2010 alleging stomach pains, rectal bleeding, and alleged denial of medical attention.  (Meisel SUF Ex. N; Ex. B at 125.)  Because this grievance was determined to be a continuation of a prior event, the grievance was rejected as frivolous but was nonetheless investigated.  (*Id.* Ex. N at 2; Ex. B at 125-131.)  During the investigation, LCP staff determined that Johnson's medical needs were not being neglected, since he was seen by medical staff, received medications, was scheduled for a follow-up appointment, and an order was placed for a consult for a colonoscopy.  (*Id.* Ex. N at p. 2.)  He filed his eighth grievance on October 7, 2010, which was rejected as a result of it being duplicative of previously filed grievances.  (*Id.* Ex. O.)

He filed his ninth grievance on December 7, 2010, alleging that he had not received the Canasa medication that was prescribed to him by Dr. Bowers. (*Id.* Ex. P.) Following an investigation, this grievance was upheld. (*Id.* Ex. P at 2; Ex. B at 135-137.) This grievance was filed shortly after Johnson initiated this lawsuit.

Prior to 2001, LCP's medical services were provided by its own staff. (*Id.* Ex. B at 29.) The decision to outsource medical services to a contract provider was made for economic purposes as well as medical purposes. (*Id.* at 29-30.) PrimeCare became the contract provider in 2004. (*Id.* at 30.) Pursuant to PrimeCare's contract with LCP, Lehigh County is responsible for any costs associated with an inmate's hospitalization in excess of $25,000 per year, per inmate. (*Id.* Ex. A, App'x A at 17, 1.4; Ex. B at 27.) Warden Meisel testified that any overage with respect to the $25,000 hospitalization cap per year per inmate is the responsibility of Lehigh County, but does not come out of LCP's budget. (*Id.* Ex. B at 27.) Meisel testified that healthcare costs are concerns to everyone, including his staff, but he denied having concerns over the rising costs associated with PrimeCare's services to LCP. (*Id.* at 31.) He also denied taking steps to reduce costs associated with medical care to inmates, and testified that he did not know how much it cost the County to provide medical care at LCP. (*Id.*)

## III. <u>DISCUSSION</u>

Under the Eighth Amendment, prison officials are required to provide basic medical treatment to prisoners. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). To demonstrate a *prima facie* case of a violation of the Eighth Amendment based on the denial of medical care, a prisoner-plaintiff must establish that the defendant acted with "deliberate indifference to [his] serious medical needs." *Estelle*, 429 U.S. at 104; *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993). There are two components to

this standard. A plaintiff must make an "objective" showing that the deprivation was "sufficiently serious," or that the result of the defendant's denial was sufficiently serious. Additionally, the plaintiff must make a "subjective" showing that the defendant acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see also Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).

The "deliberate indifference to serious medical needs" standard is met when pain is intentionally inflicted on a prisoner, where the denial of reasonable requests for medical treatment exposes the inmate to undue suffering or the threat of tangible residual injury, or when, despite a clear need for medical care, there is an intentional refusal to provide that care. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (quoting *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990)); *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). This test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients. Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment.'" *Little v. Lycoming Cnty.*, 912 F. Supp. 809, 815 (M.D. Pa. 1996) (citing *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979), (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977))).

The United States Supreme Court has established that the proper analysis for deliberate indifference is whether a prison official "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 841 (1994). A complaint that medical personnel "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment [as] medical malpractice does not become a constitutional violation merely because the victim is a prisoner."

*Estelle*, 429 U.S. at 106.  When an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist.  *Nottingham v. Peoria*, 709 F. Supp. 542, 547 (M.D. Pa. 1988).  Furthermore, mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim, *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987), and if inadequate treatment results simply from an error in medical judgment, there is no constitutional violation.  *See Durmer*, 991 F.2d at 69.  However, where a failure or delay in providing prescribed treatment is deliberate and motivated by non-medical factors, a constitutional claim may be presented.  *See id.*; *Ordonez v. Yost*, 289 F. App'x 553, 555 (3d Cir. 2008) ("deliberate indifference is proven if necessary medical treatment is delayed for non-medical reasons").

In their Summary Judgment Motion, the Medical Defendants argue that Johnson has failed to meet his summary judgment burden of demonstrating that they were deliberately indifferent to his serious medical needs.  They add that, to the extent their conduct rises to the level of negligent diagnosis of Johnson's proctitis, mere negligence is not actionable under § 1983.  Warden Meisel argues that he was not deliberately indifferent because he was not directly responsible for providing Johnson with medical care; he also argues that was not deliberately indifferent on a theory that he ignored Johnson's grievances.  Johnson responds that genuine issues of material fact exist regarding whether his rectal bleeding symptoms, which persisted for over one year, constituted a serious medical need to which the Medical Defendants were deliberately indifferent.  He also argues that genuine issues of material fact exist regarding whether Meisel was aware of his serious condition and took no action to address it.  Viewing the record in the light most favorable to Johnson, this Court finds that he has failed to meet his

summary judgment burden of producing evidence sufficient to establish that Defendants were deliberately indifferent to his serious medical needs.

The record amply demonstrates that Johnson had near immediate access to medical care each time he requested it. He was seen by nurses, physician assistants or medical doctors in response to his complaints of rectal bleeding symptoms. His complaints were charted and he was given medications to alleviate his symptoms. The record also demonstrates that Johnson was non-compliant with the recommendations of the medical staff to adequately hydrate and use stool softeners to alleviate his constipation symptoms, and refused several requests by staff to perform a rectal exam to aid in the diagnosis of his condition. As the severity of his symptoms escalated, the record shows that the Medical Defendants reasonably responded by ordering diagnostic tests and referring Johnson to an outside specialist. The initial testing that Dr. Bowers ordered only revealed two grade-two internal hemorrhoids, which was relatively early grade hemorrhoidal disease. The record demonstrates that Johnson received hemorrhoidal medications from the prison well before this test was performed. Dr. Bowers confirmed that proctitis, his eventual diagnosis, and hemorrhoidal symptoms often mimic each other and the way to tell the difference would be through a colonoscopy. Defendants then provided Johnson with a colonoscopy. Dr. Bowers, like the Medical Defendants, told Johnson to increase his fiber intake, and ordered a fiber supplement and stool softener. Following the colonoscopy Dr. Bowers diagnosed hemorrhoidal disease, active colitis consistent with ulcerative proctitis and inflammatory bowel disease, and reported that Johnson should be started on Canasa anti-inflammatory suppositories. The only evidence Johnson has produced to arguably show deliberate indifference is the delay between October 22 and December 2, 2010, in Defendants providing Johnson with Canasa. (Pl. Ex. 7 at 3.) This Court notes, however, that Dr. Bowers did

not actually prescribe Canasa on October 22; he only reported that Johnson should be started on the medication. After he formally prescribed Canasa, there is no evidence of any delay in the medication being provided to Johnson.

This Court finds that the alleged delay in referring Johnson to a specialist did not constitute deliberate indifference. Once he was referred, Dr. Bowers found that Johnson's proctitis was only a mild condition, meaning he experienced some inflammation and redness, and edema of the tissues consistent with inflammation, but that his condition had not risen to the level of severe or significant. He opined that it would be reasonable for a doctor to recommend that a patient increase fluid intake, and prescribe medications such Colace, Metamucil, and Dulcolax to treat constipation or hard stool.

Because Johnson's medical needs were not deliberately ignored by the medical staff, this Court finds that Johnson has failed to meet his summary judgment burden of presenting evidence that Defendant PrimeCare was deliberately indifferent on a theory that it failed to adequately train or supervise its employees. (*See* Am. Compl. ¶ 40.) Likewise, Johnson has failed to meet his summary judgment burden of presenting evidence that Defendant Meisel was deliberately indifferent on a theory that he instituted a policy or practice that encouraged, tolerated, or ratified the deliberate indifference of others. (*See* Am. Compl. ¶ 38.) This Court also finds that Johnson has failed to meet his summary judgment burden of presenting evidence that Meisel was deliberately indifferent on a theory that he improperly ignored Johnson's grievances. (*See* Am. Compl. ¶ 23.) The record demonstrates that each of Johnson's grievances were adjudicated in accordance with the LCP grievance policy and, with one exception, were found to be unsubstantiated because Johnson was receiving medical care. The one grievance that was upheld was his ninth grievance on December 7, 2010, alleging that he had not received medication that

was prescribed to him by Dr. Bowers.  Following an investigation, this grievance was upheld, and there is no evidence presented that Johnson was thereafter denied  Canasa.  Finally, the only other incident Johnson raises to show that Meisel was deliberately indifferent — that Meisel conducted no investigation of his own before denying the appeal of the third grievance relating to alleged disrespectful conduct by a nurse — does not concern his medical condition.

For these reasons, this Court grants Defendants' Motions for Summary Judgment.  An appropriate order follows.